735 So.2d 49 (1999)
Brian K. CAMPBELL
v.
BENSON BMW/ISUZU/VW, INC.
No. 98-CA-861.
Court of Appeal of Louisiana, Fifth Circuit.
March 10, 1999.
*50 Timothy J. Falcon, Deani A. Beard, Falcon Law Firm, Marrero, Louisiana, Attorney for Appellant Brian K. Campbell.
John B. Peuler, Gregory L. Ernst, McAlpine, Peuler & Cozad, New Orleans, Louisiana, Attorneys for Appellee Benson BMW/Isuzu/VW, Inc.
Panel composed of Judges H. Charles GAUDIN, JAMES L. CANNELLA and MARION F. EDWARDS.
CANNELLA, Judge.
Plaintiff, Brian Campbell, appeals from a judgment dismissing his claim for workers' compensation benefits. We affirm.
On February 22, 1995, plaintiff was employed by Benson BMW/Isuzu/VW, Inc. When plaintiff arrived at work that day, he turned off the outside lights by flipping a switch on a timer box. Plaintiff's hand came into contact with a terminal and he received a shock. Shortly thereafter, complaining of dizziness, shortness of breath and trembling he was sent to defendant's occupational medicine physician, Dr. Mark Acosta. The next day, plaintiff returned to his job as finance and insurance manager. He continued to work until he was terminated, approximately one month later, for overstating income on certain reports.
After his termination, plaintiff returned to Dr. Acosta because of headaches, dizziness and intermittent feelings of warmth. He was subsequently seen by numerous physicians for neck and back complaints, headaches and memory loss.
Plaintiff filed a Disputed Claim for Compensation on April 17, 1995. Trial was held on September 11 and 12, 1997 and on November 24, 1997. Judgement was rendered on March 5, 1998 dismissing the claim because plaintiff had forfeited his rights to compensation under La.R.S. 23:1208 by wilfully making false statements in order to receive workers' compensation. The workers' compensation judge found that plaintiff consciously faked his symptoms, which were inconsistent with any possible injuries from this accident and that, at trial, he continued to fabricate, selectively forget and exaggerate his injuries under oath.
On appeal, plaintiff asserts that the judge was manifestly erroneous in determining that plaintiff wilfully misrepresented facts in order to obtain benefits and that plaintiff failed his burden of proof that he incurred the asserted injuries as a result of the accident.
Plaintiff contends that he sustained a head and brain injury when the electrical shock caused him to hit his head against a concrete or brick wall. He testified that he was dazed and shaken following the shock. He does not remember what happened between the incident and when he became aware again five to ten minutes later. He told another employee and, when his supervisor came to work shortly after, he was sent to Dr. Acosta. According to the supervisor, Elmore Desvigne, plaintiff was disheveled, his face was red and he was trembling.
At trial, plaintiff testified that the injury resulted in short term memory loss and concentration difficulties which are so severe *51 that he can no longer work in the automobile business. His wife supported his testimony and reiterated his difficulties. Both noted that he takes notes of conversations and uses the note taking and a timer to help him remember.
Plaintiff was seen by Dr. Acosta twice. In both visits, he complained of headaches and dizziness. The doctor diagnosed him with muscle contraction headaches.
Plaintiff next sought treatment on March 29, 1995 with Dr. Maria Palmer, a neurologist, for neck pain, headaches occasionally associated with nausea, difficulty in concentrating and insomnia. He was tender in the cervical area upon palpitation. An Magnetic Resonance Imaging (MRI) and Electroencephalogram (EEG) performed by Dr. Palmer were normal. Based on the history provided by plaintiff that he was thrown against the wall from the shock, Dr. Palmer diagnosed a head injury, concussion, post-traumatic headaches and cervical sprain. On a second visit, he complained of daily headaches, nausea, and numbness in the fourth and fifth fingers of the right hand. On examination, the doctor found marked muscle spasms and recommended physical therapy. She prescribed some medications.
Plaintiff was evaluated at the Tulane University Medical Center (Tulane) in April of 1995 by Dr. Michael Ballard, an internist, Dr. Daniel Trahan, a neurologist, and Dr. Raul Rodriguez, an orthopedic surgeon. His complaints were radiating neck pain, daily nausea, difficulty in concentrating and headaches. A second MRI was negative. On their recommendation, plaintiff began a course of physical therapy in August for the cervical problems, which continued until January of 1996. Some improvement in mobility was noted. The doctors at Tulane recommended further neurological studies when he failed to improve significantly.
In November of 1995, plaintiff was seen by Dr. James Williams, an orthopedic surgeon, on referral from defendant. His complaints were radiating neck pain and numbness, right leg cramps and intermittent right foot numbness, frequent headaches and low back pain. He denied any prior problems with his neck or low back. X-rays taken in the office were negative.
Plaintiff switched to the Ochsner Foundation Hospital (Ochsner) team of doctors in November of 1995 and was first examined on November 29, 1995 by Dr. Rand Voorhies, a neurosurgeon. Plaintiff initiated treatment at Ochsner because defendant was not paying for his treatments and he was covered under his wife's insurance. The Ochsner team included a neurosurgeon, a neurologist, an orthopedic surgeon, an occupational therapy specialist, a psychologist and a psychiatrist.
Plaintiff told the doctors at Ochsner that he was blown back into a wall by the electrical shock and that he remembered nothing until he found himself in a colleague's office. He complained of pain in his shoulders, neck, back and weakness on one side of his body and cognitive complaints of memory loss, inattention, concentration and lack of energy. He was initially diagnosed with a closed head injury based on the history given by plaintiff. After numerous tests, the team concluded that plaintiff had no physical basis for his complaints and that his complaints were psychological in origin.
Plaintiff first complained of memory problems to Dr. Richard Wakeman, the Ochsner clinical neuropsychologist in March of 1996. Dr. Wakeman tested plaintiff and found mild memory impairment, attention and concentration deficits. The doctor stated that a closed head injury involves no skull fracture and unconsciousness could be a matter of seconds. He found plaintiff to be mildly depressed and anxious about his condition. He felt the problems were psychologically based, but were the result of the accident. Dr. Richard Mestayer, III, the psychiatrist agreed.
Dr. Kevin McKinley, the neurologist, was convinced that plaintiff is malingering or consciously faking his symptoms. The *52 doctor noted that the psychological tests are subjective and the results can be manipulated by the patient. Dr. McKinley stated he and the other doctors discussed the fact that plaintiff changed his posture when no one was watching. If he was being observed, he was hunched over like someone who had been beaten.
Neither Dr. McKinley or any of the other Ochsner doctors were able to verify that plaintiff had any physical injury. However, Dr. McKinley noted that plaintiff complained of insomnia and he agreed that lack of sleep could interfere with memory. Nevertheless, they concluded that plaintiff's problems were psychological and the focus should be on psychiatric intervention.
Plaintiff next sought treatment from Dr. Kaleem Arshad, a psychiatrist, on October 8, 1996. He is presently being treated by Dr. Arshad. Plaintiff was referred to him by the doctor's social worker associate. Plaintiff complained of poor concentration, lack of sleep, fragmented memory, fear and anxiety. He was slightly disheveled, nervous, his hands were shaking, he stuttered and complained of headaches. The doctor found plaintiff depressed, sad and angry about his situation. He told the doctor he received an electrical shock and was thrown against a wall. He claimed that he injured his ribs, back and neck and that he had a knot on his head. Notably, no doctor found any physical evidence of head trauma nor did plaintiff ever complain of rib pain. Dr. Arshad sees plaintiff every 4 to 6 weeks and his associate sees him regularly as well. The doctor changed the medications prescribed by the Ochsner doctors.
Dr. Arshad diagnosed plaintiff with organic mental disorder and depression resulting from a physical illness or incident. Dr. Arshad reached these conclusions based on the history given to him by plaintiff and his test results. He felt that the brain injury resulted from the physical impact. He felt that plaintiff's clinical behavior was in line with the conclusion reached by Dr. Kent Foster at the Health Care Rehabilitation Center in Austin, Texas.
In March of 1997, plaintiff sought treatment at the Health Care Rehabilitation Center which specializes in the treatment of patients with the diagnosis of neurological injury and behavior disorders. During the week of March 9, 1997, he was examined by a team led by Dr. Foster, a neuropsychologist. The other team members were a speech therapist, a vocational rehabilitation specialist, a nurse and a social worker. All of his records were reviewed by the team members and plaintiff was given tests by the specialists over the course of the week, including a battery of psychological tests. At this time, plaintiff added to his list of complaints an "extinction" condition in which he claims he cannot experience one side of his body. Dr. Foster called this an attention disorder, not a sensory one.
Dr. Foster testified that plaintiffs history and the test results indicate plaintiff has a brain injury resulting in slow information processing. He found plaintiff's memory profoundly impaired. Dr. Foster diagnosed plaintiff with severe cognitive disabilities related to damage to the left side of the brain. According to Dr. Foster, plaintiff has general dysfunction affecting the speed of information processing and his attention abilities. He disagreed with Dr. Bianchini and the other doctors who testified that the symptoms of head or brain injuries always improve. He also disagreed with the statements by the other physicians that brain and head injury symptoms do not always appear immediately after a head injury. He pointed out that he diagnosed a head injury, not an electrical injury to the brain. In a head injury, the more subtle cognitive disabilities are often not apparent to the layman or on cursory examination. Further, some deterioration may result when the non-damaged areas fail to receive from the damaged areas the prior patterns of activity and stimulation. He believed that the *53 medical records indicate that a blow actually occurred and that plaintiff lost consciousness for 5 to 10 minutes. He noted that Dr. Palmer diagnosed a head injury with concussion. He concluded that the symptoms are consistent with a head injury due to the force of hitting his head, not from an electrical injury. He further stated that medications could have suppressed the anxiety leading to the stuttering that showed up later in plaintiff's treatment history. Dr. Foster also testified that overt signs of injury to the scalp or head are not required to diagnose brain injury. His example was the shaken baby deaths. For the future, Dr. Foster stated that plaintiff needs individual therapy, combined with family and group therapy, as well as extensive vocational training in which he can be taught ways to compensate for his problems, such as note-taking and the use of timers for reminders.
Dr. Foster does not believe that plaintiff is malingering. He disagreed with defendant's neuropsychologist, Dr. Kevin Bianchini, that the test results indicate that plaintiff consciously skewed the test results by giving false answers or not trying. Dr. Foster believes that plaintiffs memory deficit is related to his encoding of information as he receives it and that encoding problem would cause the test results that Dr. Bianchini relies on to prove that plaintiff is malingering. Dr. Foster testified that there is a brain syndrome that will produce the exact results that occurred in Dr. Bianchini's test. He stated that Dr. Bianchini's test for malingerers is only effective if the patient is neurologically intact. However, Dr. Foster agreed that all of these tests require the best efforts of the test taker and the results are subject to manipulation by the patient. Dr. Foster also agreed that there is nothing in the record that would explain memory lapses related only to those matters that could be hurtful to plaintiff in some way or another.
Dr. Rennie Culver, defendant's psychiatrist, examined plaintiff on one occasion on January 16, 1997. He concluded that plaintiff was malingering. He stated that he teaches courses on malingering, which are wilful and conscious misstatements done for a readily recognizable purpose. He said the diagnostic manual used in the mental health field lists four criteria that he considered, along with the patient's records, textbooks and learning from courses he has taken over the years. The Diagnostic and Statistical Manual, Fourth Ed. (DSM-4) criteria are: whether the case arises from a civil or criminal proceeding, whether the patient has an anti-social or sociopathic personality disorder, whether there is a gross discrepancy between the claimed degree of distress and the objective clinical findings, whether the symptoms are inconsistent with a known medical illness or psychiatric problem, and whether the patient is cooperative. He noted that plaintiff's complaints varied from time to time and exam to exam, he is involved in civil litigation and there is a gross difference between his claims of distress and the objective findings.
Dr. Culver also stated that malingerers tend to idealize their pre-accident functioning by suppressing relevant past medicals or describing everything before the accident as wonderful and by enhancing their present difficulties. In this case, the records show that plaintiff suppressed his history of previous back problems, was untruthful about driving since the accident, claimed he was offered a job by another dealership but was only told to apply for the job and assumed strange postures in the doctors' offices when he was being observed. Further, his overall presentation does not conform to any known physical or mental illness. The doctor stated that a big giveaway of malingering is that the person presents himself according to how a layman might perceive a person suffering from the illness might act.
Dr. Culver testified that no electric burn was noticed by any doctor. He simply had a minor electric shock, a mild concussion and cervical strain, none of which could *54 cause the extent of the claimed symptoms. Although the shock and concussion could cause transient effects of short term memory problems, headaches and irritability, those problems would be resolved 6 months after the accident. Dr. Culver concluded plaintiff did not suffer from post-traumatic stress syndrome or depression due to any closed head injury. In addition, he stated that plaintiff is exhibiting selective advantageous amnesia. However, when a patient has organic brain injury which results in the patient making false statements, the false statements are patently false and not self-serving. Plaintiff, however, has made false or inaccurate statements about subjects that could hurt him in the litigation, but had no trouble with the details of the achievements in his life. Dr. Culver said he did so without the use of notes. Dr. Culver also finds the report submitted by Dr. Foster "iffy" because it is not supported by any neurological evidence. He stated that he found nothing in his examination that would prevent plaintiff from returning to work.
Dr. Bianchini, defendant's expert neuropsychologist and clinical psychologist, evaluated plaintiff in April of 1997, after Dr. Foster's examination. He tested plaintiff over 3 days and concluded that plaintiff is malingering. Dr. Bianchini claims that the minor electrical shock plaintiff received could not have caused the severe symptoms claimed by plaintiff. In order to have sustained residual injury, the electric current would have had to pass through the body, whereas here, the current touched him but arced away. Dr. Culver stated that the amount of damage from electric shock is directly related to the amount of current touching the person. Further, he notes that none of the doctors observed either a burn on plaintiff's fingers or anything external injury on plaintiffs head. Furthermore, the EEG and MRI's did not show any loss of oxygen to the brain. Dr. Bianchini testified that a person can have mild brain injury that does not show on the EEG, but the symptoms from such a mild injury would have improved by this time and would have manifested immediately. Even if plaintiff lost consciousness for 10 minutes, this would be classified as a mild injury. Dr. Bianchini said that the symptoms that plaintiff claims would only occur with severe injury and that they are inconsistent with plaintiffs version of what happened.
Dr. Bianchini stated that his tests included specific tests for malingering. He insisted that plaintiff's test results were highly unlikely to occur by chance. By chance alone, plaintiff should have scored higher than he did. Dr. Bianchini explained the different conclusions reached by Dr. Foster. He said that Dr. Foster's tests were not geared to detect malingering, that Dr. Foster never questioned plaintiff's motivation and accepted the events as given by plaintiff. In addition, Dr. Foster's verbal impairment results show a very low percentage and at that level, plaintiff would not be able to remember a conversation from beginning to end. This was also inconsistent with the level of injury. Dr. Bianchini said that even if plaintiff lost consciousness for 5 to 10 minutes, some of his complaints might occur, but again, would have shown improvement and would not affect plaintiffs long-term memory. The doctor explained that a patient with brain injury does not lose the long term memory, only new learning or short-term memory. There are exceptions, such as an amnesia disorder, which is not consistent with these facts. In addition, a brain injury would not cause a person to "fill in the gaps" incorrectly or fabricate facts and believe the fabrication. Dr. Bianchini testified that brain injured persons get better because some parts of the brain take over the function of the disrupted or dead parts. If there is swelling, as it goes down and the brain returns to normal. Dr. Bianchini testified that there are some factors that can cause the patient to suffer a decline. He listed alcohol consumption, sedating drugs and the overlay of psychological/psychiatric symptoms and seizures. However, sedation *55 medication would only affect the attention concentration, which would be fairly noticeable, but would not cause severe memory deficits or global neurocognitive problems. Although plaintiff accused Dr. Bianchini of not allowing him to take breaks and locking him out of the office at lunchtime, the doctor said that plaintiff was provided the opportunity to take breaks and go to lunch.
The evidence showed that plaintiff complained of neck and back pain, radiating pain in his left arm and hand and of dizziness at various times in 1986, 1988 and 1991, related to an on the job injury, a car accident and a motorcycle accident. Plaintiff was treated by a chiropractor for whiplash for eight months after one accident. However, in his depositions taken in January of 1996 and October of 1996, he either denied or minimized the events. He also denied to the current doctors having these problems. Despite these lapses in memory, he was able to provide other details of his military career and prior work experiences as an air traffic controller and server with the White Hand catering company. At trial, he was able to recall events several years in the past, as well as recent events, including his current medical care and his current activities. However, he had been advised to use notes to help his memory and referred to them at times. The record was unclear as to when he began to jot down notes. Nonetheless, plaintiff denied ever driving his car after the accident, yet was discovered driving on 2 out of 3 occasions in which he was videotaped by private investigators. Plaintiff attempted to blame these lapses of memory on the brain injury.
Plaintiff also contends that his termination was unwarranted because he computed the reports in the customary way. He testified that he could not have skewed the numbers to his benefit for payment because his input into the computer was limited and he got paid only on what actually went into the office. This was contradicted by the general sales manager in his deposition. It was supported by Elmore Desvigne, Jr. (Desvigne), a co-employee who also testified by deposition, that the reporting system had changed when a new general manager and general sales manager took over. Desvigne contended that plaintiff's reports had been fine until then. The only benefit plaintiff may have received from the incorrect reports was to "make him look good", but he could not have received any more money. Desvigne stated that plaintiff was a nervous person and that several times after the accident plaintiff had to leave work because of headaches. Desvigne was also terminated shortly after plaintiff. In his opinion, the new management team did not want them there. The company offered both men jobs in sales because the managers knew that they would refuse because of the reduction in income. The general sales manager, Greg Crafton, testified in deposition that plaintiff was paid in commissions and that the income report directly affected how much he was paid. He stated that generally an employee will overinflate the income report if he knows that he is leaving.
Plaintiff bears the burden of establishing the causal connection between the disability and the accident in a workers compensation action, by a reasonable preponderance of the evidence. Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La.1/14/94), 630 So.2d 1303, 1306-07; Cochennic v. Dillard's Dept. Store Warehouse, 95-705 (La.App. 5th Cir.1/17/96), 668 So.2d 1161, 1166; writ denied, 96-C-0419 (La.3/15/96), 669 So.2d 417; Langley v. Bechtel Co., 97-260 (La.App. 5th Cir. 3/11/98), 708 So.2d 1233, 1236. Additionally, the appellate court's review is governed by the manifest error or clearly wrong standard. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Cochennic v. Dillard's Dept. Store Warehouse, 668 So.2d at 1161; Starkman v. Munholland United Methodist Church, 97-661 (La.App. 5th Cir. 1/14/98), 707 So.2d 1277, 1284, writ denied, *56 98-0400 (La.3/27/98), 716 So.2d 891. The manifest rule extends to credibility determinations based upon conflicting medical testimony. Starkman v. Munholland United Methodist Church, 707 So.2d at 1284.
Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d at 840, 844-45 (La.1989); Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Through DOTD, 617 So.2d at 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through DOTD, 617 So.2d at 882.
La.R.S. 23:1208 provides in part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
In this case, there was conflicting evidence as to whether the injury claimed by plaintiff caused the severity of the symptoms he claimed to experience. The judge made a credibility determination and found that plaintiff was wilfully untruthful in his complaints for the purpose of obtaining workers' compensation and that, as a result, plaintiff forfeited any benefits he might have been entitled to receive. This was based on the medical records and testimony of the various doctors who believed that these symptoms were inconsistent with the mildness of the injury and who disagreed with Dr. Foster and Dr. Ashad on this point. In addition, no doctor adequately explained the convenient lapses in plaintiff's memory of past events that might be detrimental to his case. Thus, the judge's conclusion was a reasonable one based on the evidence. We find that the judge was not manifestly erroneous in her factual conclusions.
Accordingly, the judgment is hereby affirmed. Costs of this appeal are assessed against plaintiff.
AFFIRMED.
EDWARDS, J., DISSENTS.