777 So.2d 516 (2000)
Rianna TRANCHANT
v.
ENVIRONMENTAL MONITORING SERVICE, INC.
No. 00-CA-1160.
Court of Appeal of Louisiana, Fifth Circuit.
December 13, 2000.
*518 Rianna Tranchant, Metairie, LA, Plaintiff/Appellant.
John C. Turnage, Mayer, Smith & Roberts, L.L.P., Shreveport, LA, Attorney for Defendant/Appellee Environmental Monitoring Service, Inc.
Panel composed of Judges DUFRESNE, CANNELLA and CHEHARDY.
CANNELLA, Judge.
Plaintiff, Rianna Tranchant, appeals a judgment in a workers' compensation case filed against Defendant, Environmental Monitoring Service (EMS). We affirm.
Plaintiff was employed by EMS as a fugitive emissions worker on April 2, 1999 when she was exposed to a Benzene leak at the Shell Oil Company (Shell) plant in Norco. She claimed physical symptoms from the exposure, including vomiting and nausea, and that she developed post-traumatic stress disorder (PTSD.)
On May 25, 1999, Plaintiff filed a Disputed Claim for Compensation against EMS. The trial was held on January 10, 2000. On January 28, 2000, the workers' compensation judge dismissed the claim, finding that Plaintiff failed to prove that she suffered a mental injury caused by mental stress, within the meaning of the workers' compensation statute, La. R.S. 23:1021(7)(b)[1].
On appeal, Plaintiff represented herself. She contends that the workers' compensation judge erred in his finding that her claim is not compensable. Plaintiff argues that the evidence was sufficient beyond a reasonable doubt that the event was not minor and that she suffers from PTSD as a result.
To be entitled to workers' compensation benefits, Plaintiff must prove that there was a work-related accident, resulting in a disability that was caused by the accident. Bibbins v. Boh Brothers Const. Co., 99-349 (La.App. 5th Cir.10/13/99), 746 So.2d 154, 159. Plaintiffs burden of proof is by a reasonable preponderance of the evidence. Campbell v. Benson BMW/ Isuzu/VW, Inc., 98-861 (La.App. 5th Cir.3/10/99), 735 So.2d 49, 55; Quinones v. U.S. Fidelity and Guar. Co., 93-1648 (La.1/14/94), 630 So.2d 1303, 1306-07.
The appellate court's review of a workers' compensation case is governed by the manifest error or clearly wrong standard. Campbell, 735 So.2d at 55; Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132. The manifest error rule extends to credibility determinations based upon conflicting medical testimony. Campbell, 735 So.2d at 56.
Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id. However, where documents or objective evidence so contradicts a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error, even in a finding based upon a credibility determination. Campbell 735 So.2d at 56; Rosell v. ESCO, 549 So.2d at 840, 844-45 (La.1989); Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Campbell, 735 So.2d at 56; Stobart, 617 So.2d at 882. Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Campbell, 735 So.2d at 56; Stobart, 617 So.2d at 882.
Workers' compensation is regulated by La. R.S. 23:1021 et seq. La. R.S. 23:1021(7)(a) provides as follows:

*519 (7) (a) "Injury" and "personal injuries" include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted.
La. R.S. 23:1021(7)(b) applies to claims for mental injury while in the course and scope of employment. It states:
(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.

(c) Mental injury caused by physical injury. A mental injury or illness caused by a physical injury to the employee's body shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence .

(d) No mental injury or illness shall be compensable under either Subparagraph (b) or (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
Plaintiff has the burden of proving by clear and convincing evidence that her mental disorder is the result of "a sudden, unexpected, and extraordinary stress related to the employment ..." Favorite v. Louisiana Health Care Authority, 98-721 (La.App. 5th Cir.12/16/98), 725 So.2d 556, 558. Plaintiff cannot merely show that a mental injury is related to the general conditions of employment, or to incidents which have occurred over an extended period of time. Id. The mental injury must have been caused by an unexpected and unforeseen event that occurs suddenly or violently. The extraordinary nature of the stress is determined from the point of view of the ordinary reasonable person of usual sensibilities, not from the point of view of the Plaintiff. Jeansonne v. Wick Publishing Co., 94-CA-462 (La. App. 5th Cir.11/29/94), 646 So.2d 1212, 1214, writ denied 94-C-2963 (La.2/3/95), 649 So.2d 405.
On the day of this incident, Plaintiff was instructed by EMS to perform heavy monitoring at the Shell plant. Her job was to check for chemical leaks. According to Ralph James (James), the EMS Comptroller in charge of personnel, chemical leaks, while not daily occurrences at the plant, happened frequently enough to warrant Shell hiring EMS to monitor the equipment.
Plaintiff had been employed with EMS since January of 1999, doing light monitoring. On the day before the incident, she first performed heavy monitoring. The day of the incident, Plaintiff was unsure of how to proceed. According to Plaintiff, because she was nervous about performing the heavy monitoring, she asked to return to her previous light monitoring job, but EMS refused. She was given 500 tags to attach to the equipment which she had to check. With the assistance of the Shell workers, Plaintiff embarked on her duties. At some point, she was instructed to ascend three levels of a tower to reach the "exchangers" and was also told that she was not checking enough tags. Another EMS worker, Susan Woodfin, was on the other side of the platform performing the same duties.
While Plaintiff was checking the pumps on the platform, a pressure valve on the exchanger released a stream or cloud of a chemical, which she was later told was Benzene. Plaintiff claims that the valve *520 "blew," emitting a stream of vaporous substance into the air. The emissions were between Plaintiff and the stairway. At first, Plaintiff thought the substance was steam, since this was a regular occurrence from various pieces of equipment in the plant. However, then Plaintiff smelled a gas-like odor from the emissions and became frightened. Plaintiff said that she was afraid to go through the substance to get down from the platform and did not know what to do. However, James stated that Plaintiff could have exited by the stairs. Eventually, some Shell workers arrived and escorted her down. She testified that she was up there for 30 minutes. Before they reached the bottom of the stairs, Plaintiff was told to go back to show "them" where she was doing the monitoring. When she got back down, she began vomiting. Someone "in charge" or from Shell, told her to go to the hospital to be checked for exposure to Benzene. However, her EMS supervisor refused to allow anyone to take her to the hospital, claiming that she did not have sufficient exposure to warrant medical care. Plaintiff said she was suffering from episodes of vomiting, so she contacted a family member who picked her up from the plant and took her to River Parishes Hospital.
In the emergency room, Plaintiff stated that she had been exposed to Benzene and that she had vomited twice, felt lightheaded and had pain across her chest. She was discharged upon feeling better. She gave a urine sample for testing. No Benzene was found. Plaintiff returned two more times to the emergency room with complaints of nausea, vomiting and frontal headaches on April 5 and April 7, 1999. At different times, she was told to drink fluids, use Ocean Spray nose drops and was prescribed Tylenol for headache, ferrous sulfate for possible Benzene exposure and Phenergan for nausea. On April 5, 1999, she refused further blood work and the Phenergan. Plaintiff was diagnosed with anemia and instructed to go to a private physician.
Plaintiff was subsequently seen on April 13, 1999 by Dr. Dominic Arcuri, III. At that time, Plaintiff complained of nausea, lightheadedness, laryngitis, headaches and nosebleed. Lab analysis was ordered and on April 22, 1999, the doctor informed EMS that she was unable to return to work until he received the results of her lab work. Plaintiff returned to the doctor on April 26, 1999. Her complaints were nausea, occasional vomiting and hoarseness. On the third and last visit, May 5, 1999, the doctor reported that Plaintiff said that she had tried to go to work, but had become dizzy and suffered a headache from the "smell" at work. She was still complaining of nausea and being dizzy. On May 5, 1999, Dr. Arcuri released Plaintiff to return to work since the lab report was negative. Dr. Arcuri's medical notes indicate that he told her to obtain a psychiatric evaluation if the symptoms persisted.
Plaintiff's symptoms continued and on July 1, 1999, she went to Dr. Adrian Blotner, a psychiatrist, for evaluation. She told the doctor that she was on the highest platform of the area on top of a pressure vessel when there was an "explosion" during which she was exposed to Benzene. She claimed that she was exposed for 30 minutes, breathing the fumes. Plaintiff recited a myriad of claimed continuous physical symptoms after the exposure for three to four weeks including, ringing in the ears, dizziness, nausea, vomiting, severe headaches, high fevers, sensitivity to light, chest pain, shortness of breath, palpitations, "gurgling" in her chest, constipation, diarrhea, severe insomnia, severely decreased energy, impaired concentration, depressed mood, irritability, and anxiety. Dr. Blotner's report indicated that Plaintiff claimed to experience all of those symptoms for two months, but that the vomiting was every few days and the diarrhea was occasional. She also said that she had impaired new learning and daily heartburn. Plaintiff told Dr. Blotner that she suffered daily episodes of depressed moods characterized by feeling helpless and hopeless *521 and that she was "staying to herself." Dr. Blotner reported that Plaintiff related her anxiety to feeling like she was on the platform again and said that she vomits when she attempts to or thinks about going back to work. She complained about nightmares related to the event and said that she spends most of her waking hours trying to avoid thoughts, feelings, activities, places or people that remind her of the incident. The doctor reported that Plaintiff said she is more detached from her family and has lost interest in her previous activities. Dr. Blotner diagnosed Plaintiff with PTSD.
Plaintiff returned to Dr. Blotner on November 15, 1999. The delay was due to lack of administrative approval by EMS. She added complaints of scalp irritation and redness, hair fallout for the previous two months, left leg and arm numbness, neck muscle tension and spasm to her continuing previous complaints. She also stated that she was preoccupied with thoughts of cancer and dying. The doctor again diagnosed Plaintiff with chronic PTSD. Plaintiff last saw Dr. Blotner on December 8, 1999, with unchanged symptoms. The doctor found Plaintiff totally disabled due to her inability to function.
EMS referred Plaintiff to another psychiatrist, Dr. Rennie Culver. Dr. Culver spent two hours and 40 minutes obtaining a history and examining Plaintiff. He also reviewed her medical reports, including the ones submitted by Dr. Blotner. Dr. Culver disagreed with the PTSD diagnosis. According to the history which Plaintiff gave to Dr. Culver, at the time of the incident, one of the Shell workers informed her that she could get very sick from Benzene exposure and the emergency room doctor told Plaintiff that she could get cancer. Plaintiff suffered from bad frontal headaches, two or three times per day, nausea, vomiting, sleeping only two to three hours of sleep per night, nightmares about being blown up, bouts of diarrhea two to three times per week and constipation once a week. She said that her heart or chest "gurgles," she gets short of breath and she gets nervous when she leaves the house. Plaintiff told Dr. Culver that she gets frightened in elevators, fearing that she will be blown up or get stuck and can't get out. She cannot go to filling stations because the smell of gasoline makes her sick. She had the same reaction to the smell of the plant when she attempted to go back to work. Plaintiff said that she cannot go to restaurants because the food smell makes her sick. She has nightmares all of the time that her house will blow up because she lives close to the plant. Her throat itches and her neck bled from scratching a month before this visit. Plaintiff also claimed that she suffers from terrible heartburn and that none of the medicine given to her relieved the condition. She also complained of tinnitus of the right ear, numbness in both arms and right leg, and repeated swelling of her neck. Dr. Culver reported that Plaintiff suffers anxiety when she leaves her house or is "going places" and that leaving her house causes an increase in her many somatic symptoms. Therefore, she spends more time at home, which upsets her husband, who is aggravated and frustrated with her, her attorney and EMS.
Four months before the visit with Dr. Culver, Plaintiff's husband obtained a job in Mississippi that required him to be gone from 5:00 a.m. until 8:30 p.m. Plaintiff stopped driving a few years before this incident and relies on others to drive her. When her husband was working long hours, her mother drove her where she needed to go. According to Dr. Culver, Plaintiff claimed to have lost weight because she cannot keep food down, but was the same weight that she was when the incident occurred. She denied alcohol or illegal drug use and had no history of previous psychiatric or mental health treatment. The doctor conducted a mental status evaluation and found her intelligence to be within average range, but with marginal abstraction ability.
*522 Dr. Culver diagnosed Plaintiff with "undifferentiated somatoform disorder and personality disorder with histrionic (hysterical) features". He noted that despite the absence of any objective medical findings (other than anemia) after the incident, Plaintiff's complaints have escalated. Dr. Culver stated that he was unable to determine how Dr. Blotner reached his conclusion that Plaintiff has PTSD. He stated that while Plaintiff was exposed to some sort of vaporous substance, it is difficult to see how it could have been life-threatening, a requirement for a PTSD diagnosis. Furthermore, even if she had been exposed to Benzene, the levels must have been extremely low given the absence of any detectable levels of phenol, a metabolite of benzene, in either her blood or urine. He noted that her urine was obtained the same day as her exposure. Dr. Culver reported that most of Plaintiff's symptoms are physical and that they have escalated over time. Dr. Culver stated that these many physical symptoms are not related to PTSD, the symptoms of which are psychological or psychiatric. He states that, although Plaintiff described a number of dreams of explosions, she was not in an explosion. The Plaintiff even admitted that steam is regularly released from the equipment. Thus, Dr. Culver failed to find the sine qua non of PTSD, a life-threatening traumatic event. However, he felt that she was clearly suffering from an undifferentiated somatoform disorder, characterized by many subjective complaints referable to several organ systems and for which no objective findings exist to explain those complaints. In addition, he found that her manner of speaking, fantasies, and her emotional "lability" indicated that she is highly suggestible and, if not a histrionic personality, she has a great many traits of persons with that personality disorder. Dr. Culver found it significant that Plaintiff was told by the Shell worker that she could get sick on a long-term basis and by Dr. Arcuri that "all my symptoms were from chemicals," although she was not significantly exposed to any chemical. He concluded that Plaintiff's symptoms are not consistent with exposure to a chemical, but are those symptoms that she thinks or imagines the symptoms of chemical exposure to be. He also noted that Plaintiff has dependency conflicts which are consistent with histrionic personalities, who like attention and want to be taken care of by others. He believed that Plaintiff is acting out through her illness, which has justified her regressing to the point that not much is expected of her. He thought that her husband's job absences are related to the escalation of her symptoms.
In addition, Dr. Culver stated that Plaintiff has agoraphobic symptoms, since leaving her home causes anxiety and increased somatic symptoms. Dr. Culver noted that personality disorders originate in childhood and are not caused or precipitated by events which occur in adult life. He concluded that the Plaintiff is not disabled from working, except to the extent that she has convinced herself that she can no longer return to work.
After reviewing the evidence in this case, we find no manifest error in the workers' compensation judge's conclusion that Plaintiff had to prove a mental/mental injury since there was no physical injury related to the incident that could have caused Plaintiff's many symptoms. We further find that the worker's compensation judge was not clearly wrong in finding that Plaintiff did not prove a mental/mental injury by clear and convincing evidence. There was no unexpected and unforeseen event that occurred suddenly or violently. The escape of the chemical was similar to the steam releases. Further, the release of chemicals from the equipment in that manner was an expected event. It was because of those incidents that the EMS workers were hired to monitor the equipment. Thus, from the point of view of an ordinary reasonable person, the stress caused by the event itself does not meet the test of R.S. 23:1021(7)(b).
*523 Furthermore, the workers' compensation judge accepted the conclusion of Dr. Culver over that of Dr. Blotner that Plaintiff does not have PTSD. This is a reasonable finding based on the conflicting evidence. Thus, we find that the workers' compensation judge did not err in finding that Plaintiff failed to prove by clear and convincing evidence that any of her symptoms are related to chemical exposure.
Accordingly, the judgment of the workers' compensation judge is hereby affirmed. Costs of this appeal are to be paid by Plaintiff.
AFFIRMED.
NOTES
[1] This is generally referred to as mental/mental injury.