847 So.2d 85 (2003)
Lela FOY-WATSON, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee.
No. 37,106-WCA.
Court of Appeal of Louisiana, Second Circuit.
May 14, 2003.
*86 The Law Office of Alex S. Lyons by Alex S. Lyons, Jeffrey Lee Little, Shreveport, for Appellant.
Lunn, Irion, Salley, Carlisle & Gardner by J. Martin Lattier, Walter S. Salley, Shreveport, for Appellee.
Before WILLIAMS, STEWART & PEATROSS, JJ.
PEATROSS, J.
This appeal arises from a workers' compensation judgment denying workers' compensation benefits to the plaintiff, Lela Foy-Watson ("Watson"). Watson now appeals the judgment. For the reasons stated herein, we affirm in part, reverse in part and remand for further proceedings.

*87 FACTS
In January 1999, Watson worked as an environmental technician for General Motors Corporation ("GM") at the GM Truck Assembly Plant in Shreveport. On the evening of Saturday, January 30, 1999, Watson was tasked to pick up and distribute tools. The production line was closed for the weekend and the area where she was working was poorly lit because the plant's main lights were off. While she was working, Watson tripped and fell to the ground when something caught her foot. When she fell, Watson tried to catch herself with her hands and ended up falling on her hands and knees and then onto her stomach and chest, hitting the ground hard. There were no witnesses to the accident.
Watson told the security guard on duty at the plant that she had injured herself and she was sent to the emergency room at Willis-Knighton Hospital.[1] When she was admitted, she filled out a form where, under a section captioned "chief complaint," she wrote:
Knees hurt, hands hurt and ribs on left side of my body.
Watson did not list back pain on this form; however, the physician's chart from the emergency room reflects that Watson complained of right knee and wrist pain with back discomfort and that she was "sore everywhere." Despite this notation, the treating physician wrote that he found no "obvious" back injury during an examination of Watson's body.
On Monday, February 1, 1999, when the plant reopened, GM made a report of Watson's accident. This report indicates that Watson was "walking in area toward platform" when she fell and that she suffered a "contusion of chest wall: rib-left." Watson filled out a form captioned "Employee's Report of Occupational Injury or Disease." The form asked the employee to list:
Nature of injury or disease. (Describe FULLY. Include all parts of body affected.)
Watson wrote:
Both hands, both knees, and left side ribs
Watson did not include any alleged back injury in her report.
On that same day, Watson went to Willis-Knighton's "Work Kare" facility and came under the care of Dr. Tony Alleman. At this time, Watson filled out a medical history form and reported no history of back pain. Dr. Alleman diagnosed Watson with a contusion to the left chest wall and strained left wrist and knee and released her to sedentary work for six to eight days. She returned to Work Kare on February 5, 1999, with complaints of left knee pain, wrist numbness and pain "everywhere" in her legs. Chest x-rays from that date revealed "normal left ribs." Watson was seen that day by Dr. James Harris who diagnosed contusions to her left chest and knee and a possible sprain of her left wrist and again released her to sedentary work only. She had similar complaints of pain when she revisited Work Kare on February 8, 1999.
On February 15, 1999, Watson reported to Dr. Alleman that her symptoms had improved since the last visit, but she complained of sharp pain shooting through her legs after standing on concrete for long periods. Again, there was no mention of back pain. Dr. Alleman maintained his recommendation for sedentary work. On February 17, 1999, Watson went to Good Shepherd Medical Center in Longview, *88 Texas, on referral by Dr. Alleman. Records show that she only complained of pain in her left knee and wrist. On February 22, 1999, Watson saw Dr. Alleman again. His records reflect that Watson said she was much improved with her left knee and wrist problem. Dr. Alleman released her to light work.
On March 1, 1999, Watson had a follow-up visit with Dr. Alleman and reported that her left knee "has come a long way," but was still sore. The doctor noted that Watson's left wrist had resolved. Dr. Alleman recommended physical therapy for Watson's knee. The doctor's progress note from a March 8, 1999 visit states that Watson reported that her knee was "a lot better."
Watson returned to work without restrictions on March 15, 1999; and, on that day, when she was climbing down from her "fork truck," she later said she had "sharp pains ... all the way up from my feet all the way up to my ankles, my knees, and even my back."[2] Watson visited Dr. Alleman on March 22, 1999, and his report indicates that Watson complained of pain "from below knee down to foot on both legs." (Emphasis in original.) There was no mention of back pain. Dr. Alleman's report from Watson's next visit, March 29, 1999, reflects complaints of aching pain in both legs between her knees and her ankles and also states that she "was not complaining of pain in her right leg until the past two weeks." Watson was released to regular duty, but Dr. Alleman referred her to Dr. William Fox, an orthopedic surgeon, "as her physical findings and her previous injury are inconsistent." Dr. Alleman mentioned in his deposition that, during his treatment of Watson, she never complained of pain in her back.
On March 31, 1999, Watson saw Dr. Fox for the first time for her complaints of pain in the lower portions of both legs. The report from this visit states that Watson told Dr. Fox that this pain commenced on March 15, 1999, after the "fork truck" incident. Dr. Fox ordered MRI studies of Watson's legs to confirm whether she had bone bruises or contusions and he ordered that she not work until the MRI was conducted. After the MRI was completed, Dr. Fox reported on April 23, 1999, that the scan was "suggestive of a marrow-replacing process such as lymphoma, myeloma and metastatic disease." At his deposition, Dr. Fox explained that these processes were not in any way related to trauma.
On April 26, 1999, Dr. Fox completed a form that appears to be part of a health and accident insurance claim. Dr. Fox indicated on this form that Watson had not recovered sufficiently to return to work and estimated that she could return to work on June 1, 1999. Dr. Fox referred Watson to her family physician, Dr. James Sawyer, for further testing. On May 7, 1999, Watson saw Dr. Sawyer and his records reveal that a bone scan (conducted on recommendation of Dr. Fox) was "normal."
On May 20, 1999, Watson saw Dr. Fox again and, for the first time, complained of lower back pain. Dr. Fox recommended a lumbar MRI. On June 10, 1999, Watson had a lumbar MRI which revealed, among other things, "moderate sized central L5-S1 disc herniation with ... nerve root impingement" and other degenerative changes. On June 18, 1999, Dr. Fox again indicated on an insurance claim form that Watson was not healthy enough to return to work and estimated that she could work again on August 1, 1999. On June 25, 1999, Watson saw Dr. Tom Chow, a microneurosurgeon, who evaluated her MRI and *89 recommended a course of pain management with Dr. Aaron Calodney, an anesthesiologist with a specialty in pain management.
Watson first saw Dr. Calodney on August 3, 1999. He observed that she walked with a painful gait, that she had some weakness in her lower extremities and had a limited lumbar range of motion. Dr. Calodney recommended an epidural steroid injection followed by physical therapy. Watson also began taking pain medication, including oxycontin. Watson was evaluated by Dr. Gordon Mead on August 24, 1999, who reviewed her lumbar MRI at the same time. Dr. Mead observed that she had a bulging L5 lumbar disc, but that "it does not appear to have any nerve root impingement that I can tell." After the injection and some therapy, Watson's problem improved, but not to the degree that Dr. Calodney had hoped.
Watson eventually filed a claim for workers' compensation benefits with GM. Although, apparently, Watson received one workers' compensation indemnity benefit payment in February or March 1999, GM denied her claim for workers' compensation benefits. Watson then filed a disputed claim for workers' compensation benefits with the Office of Workers' Compensation on December 1, 1999, listing "low back" as the part of her body that was injured.
Watson later underwent a discography which revealed internal disc disruption of her two bottom discs, and it was Dr. Calodney's impression that this disruption was causing Watson's pain. A second steroid injection did not provide lasting relief, so Watson had a surgical procedure on her back on December 11, 2000, known as IDET, or intradiskal electrothermal annuloplasty. After this surgery, Watson's pain was reduced to the point that she could discontinue her use of oxycontin and her activity level significantly improved. At his deposition, Dr. Calodney related that "within, perhaps, the next six months she should probably be able to return to some form of work." Watson's pain, however, returned about two weeks prior to the trial of this matter.
At his deposition, Dr. Calodney testified that he believed, based on the history he obtained from Watson, that her lumbar problems "continue to be and have been" related to her January 30, 1999 fall at work. He specifically referred to Watson's complaints of pain to her legs "everywhere" on February 5, 1999, and stated that this pain "can be consistent" with a lumbar disc derangement.
Dr. Alleman stated in his deposition that, although it was "possible" that pain in both legs could be an indication of disc derangement, the "tightness" that Watson reported to him in February 1999 was not usually a symptom of lumbar disc problems. He also testified that, with a lower back disc herniation:
[U]sually there is a single incident that kind of initiates things and then you get symptoms, and the symptoms may not be the first day ... But usually they are within a week to ten days of the initial injury.
In addition, Dr. Fox explained in his deposition that "the sooner those symptoms appear after the accident, the more likely it is to be due to the accident." He testified that one would expect symptoms of a disc herniation like Watson's to appear within the first two weeks following the trauma. Dr. Fox, therefore, concluded that Watson's January 30, 1999 accident was not the cause of her lower back problem because her complaints of lower back pain and radiation down the legs came "a couple of months" after the accident. He did state, however, that, if the numbness and tingling in Watson's February 1, 1999 *90 medical record referred to her knee, then this could be consistent with a lumbar disc derangement. Dr. Fox also said that Watson's other pain, such as the sharp pains in her legs she reported on February 15, 1999, could be consistent with disc derangement. He later explained, however, that he would expect symptoms in the patient's back to appear with a disc injury and that Watson did not report any such symptoms at the time of her injury.
Watson's records from GM indicate that she had previously made complaints of lower back pain as early as 1982 and that she had a previous and extensive history of back problems. These records include a July 19, 1982 report from orthopedist Dr. A.E. Dean referring to an x-ray of her lumbar spine that "shows some changes at the L5-S1 disc space with some spurring anteriorly and narrowing of this disc space." Dr. Dean diagnosed her then with degenerative lumbrosacral discs with acute sprain. Another physician, Dr. D.F. Overdyke, examined an x-ray of her cervical spine on November 29, 1982, and stated that the x-ray was "negative." She had further complaints of back pain at GM in 1986, 1987 and 1989. Watson also had an auto accident in 1993, from which she reported neck pain, and a trip and fall incident at work in 1995 that caused her pain in both knees. Dr. Calodney testified in his deposition that it was his understanding that Watson had not had any symptoms "referable" to her low back.
A trial was held on January 3, 2002, at which time Watson testified to her alleged back injury. The Workers' Compensation Judge ("WCJ") found that Watson failed to prove that her back injury was related to the January 30, 1999 accident and awarded her no workers' compensation benefits for any of her injuries. From the judgment denying her claim for benefits, Watson now appeals, raising the following assignments of error (verbatim):
1. The trial court committed manifest error when it concluded that Ms. Watson's lumbar disc injury was not related to the January 30, 1999 fall.
2. Even if the trial court was correct in holding that Ms. Watson's lumbar disc injury was not related to the January 30, 1999 fall, the trial court erred in failing to grant plaintiff some workers' compensation benefits for the period of disability for the injuries that were undeniably related to the January 30, 1999 fall.

DISCUSSION

Workers' Compensation Benefits for Watson's Alleged Back Injury
In the first assignment of error, Watson argues that her back injury was caused by her fall on January 30, 1999; and, therefore, the WCJ was clearly wrong in refusing to award benefits for this injury. In a workers' compensation action, the plaintiff bears the burden of establishing a causal connection between the disability and the accident by a reasonable preponderance of the evidence. Quinones v. U.S. Fidelity and Guaranty Co., 93-1648 (La.1/14/94), 630 So.2d 1303; Burroughs v. LCR-M, 34,082 (La.App.2d Cir.3/2/01), 781 So.2d 877. In determining whether the worker has discharged the burden of proof, the trier of fact should accept as true a witness's uncontradicted testimony, although the witness is a party, absent circumstances casting suspicion on the reliability of his testimony. Nolan v. Rawls Farming Company, 35,086 (La.App.2d Cir.10/31/01), 801 So.2d 524, writ denied, 02-0001 (La.3/15/02), 811 So.2d 910. The injured employee's testimony alone may be enough to meet the burden of proof as long as no other evidence contradicts the employee's version of the accident and the *91 testimony is corroborated by circumstances following the alleged incident. Burroughs, supra.
Factual findings in workers' compensation cases are subject to the manifest error/clearly wrong standard of review. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706; Corley v. Wal-Mart Stores, Inc., 31,917 (La. App.2d Cir.5/7/99), 737 So.2d 204, writ denied, 99-2002 (La.10/15/99), 748 So.2d 1151. In applying this standard, the appellate court must not determine whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Nolan, supra. If the fact finder's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if it would have weighed the evidence differently as the trier of fact. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Nolan, supra. Moreover, if there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Buxton v. Sunland Construction, 34,995 (La.App.2d Cir.8/22/01), 793 So.2d 526.
The fact finder's determinations as to whether the worker's testimony is credible and whether the worker has discharged his burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. Bruno v. Harbert International, Inc., 593 So.2d 357 (La. 1992). The manifest error rule extends to credibility determinations based upon conflicting medical testimony. Tranchant v. Environmental Monitoring Service, Inc., 00-1160 (La.App. 5th Cir.12/13/00), 777 So.2d 516.
In the instant case, the medical evidence casts suspicion on the alleged causal link between Watson's January 30, 1999 accident and her back injury. Although Drs. Alleman and Fox conceded that some of Watson's leg pain symptoms could be symptoms of, or related to, a back injury, the medical records show no complaints of back pain near in time to the accident. Dr. Fox specifically said that he did not believe that Watson's January 30, 1999 accident was the cause of the disc problem in her back because her complaints of lower back pain came months after the accident, which is inconsistent with an injury to the disc. Moreover, in reviewing the medical records, we find that, throughout the time Watson was seeing various doctors, she did not complain of back pain. Even though medical records from as early as 1982 indicate that Watson had degenerative changes in her lower back and that she had several instances of back pain in the intervening years that were sufficiently severe to report to her employer, she did not report her alleged back pain to any of her doctors this time.
The most specific evidence which goes against finding causation between the accident and the back injury came from Dr. Fox's deposition testimony, where he stated that Watson's back problem was not related to the 1999 accident because she did not report back pain within two weeks of the accident. The first documented complaint of lower back pain was made approximately four months after the accident, and the claimant's testimony does not adequately explain this delay. Watson has not met her burden of establishing a causal link between the accident and the back injury. The WCJ's finding that Watson's back injury was not caused by the January 30, 1999 accident is a reasonable conclusion based upon the record in its *92 entirety. We find that the WCJ did not commit manifest error; and, therefore, Watson's first assignment of error is without merit.

Remaining Benefits Not Addressed by the WCJ
On appeal, Watson also argues that the WCJ erred in not awarding her any benefits whatsoever, including benefits for the time she was unable to work until April 23, 1999, when she had recovered sufficiently from her knee, wrist and rib injuries to return to work. An injured employee is entitled to receive benefits for an injury that arises out of and in the course of her employment. La. R.S. 23:1031. La. R.S. 23:1311 provides:
A. The petition required under Section 1310.3 shall set forth:
(1) The names and addresses of the parties.
(2) A statement of the time, place, nature, and cause of the injury, or such fairly equivalent information as will put the employer on notice with respect to the identity of the parties.
(3) The specific compensation benefit which is due but has not been paid or is not being provided.
Watson filled out the required form, Form 1008, demanding payment from GM for indemnity benefits, medical expenses/mileage and penalties and attorney fees.[3] On the form, Watson answered the "Part of Body Injured" question by only answering that she had a low back injury. At the trial of this matter, the WCJ stated as an issue "whether claimant is entitled to indemnity benefits, specifically temporary total disability or supplemental earnings benefits from February 1st, 1999, through March 15th, 1999, and temporary total disability benefits from March 16th 1999 through January 3rd of 2002, the current date." We do not believe that Watson's indication on Form 1008 that she sustained a "low back" injury limits her claim for benefits only to that particular injury. Indeed, the blank on Form 1008 for filling in injuries is very small.
Louisiana workers' compensation law is to be liberally construed in favor of coverage. Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989). See also Gary v. D.E. Page Construction, 93-1266 (La.App. 3d Cir.5/4/94), 640 So.2d 523. The record shows that Watson missed several weeks of work due to injuries that were well-documented and that her symptoms of these injuries commenced immediately after her January 30, 1999 accident. Watson is entitled to benefits for the injuries actually sustained and proven. This matter is, therefore, remanded for a determination and award of such benefits.

CONCLUSION
For the foregoing reasons, the judgment of the WCJ is affirmed insofar as it rejects Lola Foy-Watson's claim for compensation benefits for injury to and treatment of her back. The judgment of the WCJ is reversed insofar as it denies benefits for injuries suffered by Lola Foy-Watson prior to April 23, 1999, through which time she was unable to work due to injuries sustained in the work-related fall on January 30, 1999; and, therefore, this matter is remanded to the WCJ for a determination of the amount and type of benefits owed to her for these injuries. Costs of this appeal are divided equally between General Motors Corporation and Lela Foy-Watson.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Watson would later testify that she told the security guard on duty that her back was hurting, but there is no GM documentation from that date of any back injury.
[2] Watson has not returned to work at GM since March 1999.
[3] Form 1008 is the form used for "Disputed Claim For Compensation."