STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**MICHAEL W. MITCHELL**

**VERSUS**

**WINNFIELD HOLDING CORPORATION**

*************
APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF RAPIDES, DOCKET NUMBER 02-01314
HONORABLE JAMES L. BRADDOCK, WORKERS' COMPENSATION
JUDGE

*************
**SYLVIA R. COOKS**
**JUDGE**
*************

Court composed of Ned E. Doucet, Jr., Chief Judge, Sylvia R. Cooks, and Michael G.
Sullivan, Judges.

**REVERSED AND RENDERED.**

George Flournoy
Flournoy & Doggett
P.O. Box 1270
Alexandria, Louisiana 71309
(318) 487-9858
COUNSEL FOR PLAINTIFF/APPELLANT:
    Michael W. Mitchell

Phillip Hendry
Johnson, Stiltner & Rahman
920 Pierremont Road, Suite 505
Shreveport, Louisiana 71106
(318) 866-9406
COUNSEL FOR DEFENDANT/APPELLEE:
    Winnfield Holding Corporation

**COOKS, Judge**.

## STATEMENT OF THE CASE

This is a workers' compensation appeal. Plaintiff, Michael Mitchell, was employed by Winnfield Holding Corporation, a corporation owning several companies, including Winnfield Funeral Home and Nurturing Nook Childcare Center. Mr. Mitchell was employed full-time for Winnfield Funeral Home and part-time for the Nurturing Nook. His average weekly wage at the funeral home was $344.27 and his monthly wage at the Nurturing Nook was $800.00.

On March 2, 2001, while setting up for a burial in Cloutierville, he was pulling a 270 pound grave liner to the gravesite. The ground was muddy and he slipped, injuring his lower back. The incident was witnessed by his co-workers and reported to his supervisor. Mr. Mitchell was initially seen by Dr. Breazeale, a family physician in Natchitoches. He was later referred to Dr. John Sandifer, an orthopedist, who diagnosed a chronic lumbar strain with intermittent nerve root irritation. Dr. Sandifer treated Mr. Mitchell until August 7, 2002.

The Louisiana Workers' Compensation Corporation (LWCC) is the workers' compensation insurance carrier for Winnfield Holding Corporation. Workers' compensation benefits were initiated by LWCC based on Mr. Mitchell's full-time employment at Winnfield Funeral Home. His part-time employment at the Nurturing Nook Childcare Center was not considered in the computation of benefits. Mr. Mitchell was paid $10,744.21 in indemnity benefits, medical benefits totaling $5,511.21 and vocational rehabilitation benefits totaling $1,837.94.

In January 2002, LWCC reduced Mr. Mitchell's supplemental earnings benefits (SEB) based on a job search performed by Jeff Darby, a vocational rehabilitation consultant hired by LWCC. Mr. Mitchell continued to received SEB through the date of trial at the reduced rate. In February 2002, Mr. Mitchell filed a Disputed Claim for

Compensation.

Trial on the merits was held on October 8, 2002. The workers' compensation judge denied Mr. Mitchell's claim for SEB, medical benefits and vocational rehabilitation and dismissed his claim. Mr. Mitchell filed this appeal presenting several issues for our review:

> 1. Whether the workers' compensation judge erred in not including Mr. Mitchell's part-time wages at the Nurturing Nook in the calculation for benefits.

> 2. Whether the workers' compensation judge erred in concluding the medical evidence indicated Mr. Mitchell was capable of working at his former employment at Winnfield Funeral Home.

> 3. Whether the workers' compensation judge erred in terminating all supplemental earnings, medical, and vocational rehabilitation benefits and in not imposing sanctions and attorney fees.

For the reasons assigned below, we reverse the decision of the workers' compensation judge and order a reinstatement of SEB using the correct calculation of benefits, which should include both part-time and full-time wages.

## LAW AND DISCUSSION

In a workers' compensation case, appellate review of factual findings is governed by the manifest error standard. *Godeaux v. Lewis Chapman Constr. Co.*, 02-0025 (La.App. 1 Cir. 12/31/02), 836 So.2d 670. The workers' compensation judge's finding with regard to the credibility of the plaintiff is considered a factual finding. *Campbell v. Benson BMW/Isuzu/VW, INC.,* 98-861 (La.App. 5 Cir. 3/10/99), 735 So.2d 49. Thus, the findings of the worker's compensation judge with regard to the credibility of the plaintiff are given great weight and will be upheld on appeal if there is a factual basis in the record to support the decision. *Godeaux*, 836 So.2d 670. In *Godeaux*, the appellate court stated:

> The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding

3

of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. *Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). *Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary for a finding of manifest error.*

*Id*. at 676 (emphasis added).

In this case, the workers' compensation judge based his decision to terminate SEB almost entirely on his assessment of the credibility of Mr. Mitchell *to the exclusion of the documented evidence,* including medical evidence, found in the record. The workers' compensation judge excluded Mr. Mitchell's part-time employment in the computation of benefits, finding Mr. Mitchell was still working part-time. There is no evidence in the record to support this finding. Additionally, the workers' compensation judge concluded Mr. Mitchell is able to work at his former employment at Winnfield Funeral Home performing heavy manual labor, a conclusion which is contrary to the medical evidence. We find the decision of the workers' compensation judge terminating all SEB is unsupported by the record and, therefore, manifestly erroneous.

*Calculation of Benefits*

Mr. Mitchell earned $344.27 weekly from his full-time employment at Winnfield Funeral Home and $800.00 monthly from his part-time employment at the Nurturing Nook Childcare Center. Both companies were owned by the same individual, Ben Johnson. Benefits were paid to Mr. Mitchell using only the wage calculation from his full-time employment at Winnfield Funeral Home. Excluding the wages from his part-time employment was improper. *Glynn v. City of New Orleans*, 95-1353 (La.App. 4 Cir. 4/3/96), 672 So.2d 1112. In *Glynn*, the plaintiff was employed as a fire fighter for the City of New Orleans. In addition to his job with the City he worked for Delgado City College part-time and also received supplemental pay from the State of Louisiana. Mr. Glynn injured his back while working for the

4

City of New Orleans. The court concluded: "Glynn's additional revenues from the employment other than the City and his state supplemental pay were properly included in his earnings to calculate his SEB. *See Jones v. Orleans Parish School Board*, 370 So.2d 677 (La.App. 4 Cir. 1979)." *Id.* at 1115.

The workers' compensation judge concluded Mr. Mitchell failed to prove he lost his job at the Nurturing Nook as a result of the accident. He based this finding on the deposition of Lance Crappell, CPA, and on the Vehicle Detailing and Maintenance Contract signed by Mr. Mitchell on May 29, 2000 with the Nurturing Nook. Neither of these documents supports the workers' compensation judge's conclusion.

The Vehicle Detailing and Maintenance contract indicates Mr. Mitchell was paid $200.00 a month to wash and "perform detailing and preventative maintenance on the two rental vans assigned to the Ben D. Johnson Nurturing Nook Child Care Center." The attachment to the contract reflects payment to Mr. Mitchell of $200.00 on November 30, 2000 for these responsibilities. In addition, Mr. Mitchell testified he cut the grass, mopped bathrooms and performed repair work on Nurturing Nook property. For these responsibilities the record reflects he received $600.00 on November 30, 2000. This document supports proof of employment at the Nurturing Nook and the amount of compensation but it does not support a finding that he continued to work after the accident which occurred on March 2, 2001.

The workers' compensation judge also relied on the deposition of Lance Crappell, a CPA, who was payroll administrator for the Ben Johnson Educational Foundation. Attached to the deposition of Mr. Crappell was the Employment History Report for Mr. Mitchell. The report reflects two payments to Mr. Mitchell after the date of the accident. The first payment was on March 31, 2001 for $800.00 and the second payment was on April 27, 2001 for the reduced amount of $400.00. Mr. Mitchell testified one check was for work performed prior to the date of the accident

5

and the other check was for work performed by his brother-in-law and his nephew on his behalf. There are no other payments after April 27, 2001. This document does not support the workers' compensation judge's conclusion that Mr. Mitchell continued to work for the Nurturing Nook on a regular basis after the date of the accident.

Additionally, testimony from Lance Crappell indicates the bookkeeping at the Ben Johnson Educational Foundation contained "some irregularities or potentially fraudulent activities. . . . [T]he thing was losing so much money, and apparently had so many irregularities going on, that the board members of the Educational Foundation decided that it was not a venture that they wanted to continue, so they forced it to shut down." The workers' compensation judge completely disregarded Mr. Mitchell's testimony regarding his employment at the Nurturing Nook and instead relied on admittedly unreliable payroll information to deny Mr. Mitchell's claim for benefits.

The workers' compensation judge found Mr. Mitchell concealed his part-time job at the Nurturing Nook from Annette Robinson, claims manager for LWCC. It is not clear what benefit Mr. Mitchell would obtain by concealing his part-time employment at the Nurturing Nook from Ms. Robinson since he was entitled to have both part-time and full-time wages calculated in determining his benefits. The following exchange occurred between Ms. Robinson and Mr. Mitchell's attorney regarding his part-time employment:

> Q.  Would you tell the Judge then when I first made demand do you recall in my - letter I said that - I told you that he was working at - at part-time employment? Tell the Judge what you did, if anything, to find out the nature of his work, the part-time employment, how much he was making and so forth.
>
> A.  I responded to your letter on March the 6th by way of letter advising you that we had received your letter of representation, that we were advised of the second job and to let you know that Mr. Mitchell had not recorded having worked a second job even though he was asked that question in his recorded statement. I

6

requested any information for review that you might have on wages from the second job, asked you to submit that to me and we would be glad to review it and get back with you.

Q. Okay. But let me ask you what did you do to investigate? Did you contact the Nurturing Nook? This was Ben Johnson -

A. No, sir, I did not.

LWCC did not include the part-time wages in the calculation of benefits claiming they were unaware of Mr. Mitchell's job at Nurturing Nook. However, Jeff Darby, the vocational rehabilitation consultant hired by LWCC, was aware of Mr. Mitchell's part-time employment with Nurturing Nook in July 2001. Moreover, Mr. Mitchell knew Ben Johnson and knew Mr. Johnson owned both Winnfield Funeral Home and the Nurturing Nook. It is reasonable to conclude Mr. Mitchell believed the two companies were actually one and the same employer.

While LCWW claims it did not know about the part-time employment, Ms. Robinson testified even if she had known about the part-time employment, the workers' compensation statute, as she reads it, entitled Mr. Mitchell to wages only up to forty hours per week. She stated: "And I indicated that to Mr. Flournoy in my letter, that I had given him the benefit of forty hours." We find Mr. Mitchell's part-time employment at the Nurturing Nook should have been included in the calculation of his benefits.

*Medical Evidence*

Mr. Mitchell's medical history indicates he had bilateral carpel tunnel surgery in 1998. As a result Dr. Sandifer estimated he had "approximately 5% permanent partial medical impairment of both upper extremities, secondary to the work related carpal tunnel syndromes and carpal tunnel releases." Dr. Sandifer advised him to engage in no "repetitive lifting over 20 pounds. He also should avoid activities that involve repetitive wrist flexion or extension." Mr. Mitchell returned to Dr. Sandifer's office

7

in July 7, 2000 for a flare up of his hands and wrists. Dr. Sandifer's office notes on that date reflect the following:

> Today, he has obvious swelling and tenderness in his hands and wrists. He has difficulty straightening his fingers out. I am sure that he has tendinitis of both hands and wrists with some median nerve irritation. He needs to be on restricted work activity with no lifting over 10 to 15 pounds and no repetitive wrist flexion extension activities. I placed him back in wrist splints and he needs to elevate his hands and wrists.

On April 2, 2001, Mr. Mitchell returned to Dr. Sandifer for treatment following his back injury at Winnfield Funeral Home. Dr. Sandifer diagnosed a chronic lumbar strain with intermittent nerve root irritation. An MRI taken on May 11, 2001 was normal. Dr. Sandifer ordered a FCE which was performed on August 14, 2001. The FCE report reflects the following:

> Mr. Mitchell was able to demonstrate his dynamic lifting capacity at Medium level of physical demand. However, his test results indicate bilateral grip and pinch strength weakness as well as limitation in lumbar active range of motion. With these factors, and his low perceived level of function, a return-to-work status at a Medium level would not be possible. A [l]ight physical demand level would allow material handling in the 1 to 10 lb. range for 34 to 66% of the work day.

Dr. Sandifer's office notes for September 7, 2001 provide:

> Mr. Mitchell comes back and is still having a good bit of back pain and bilateral leg pain. I have reviewed his MRI Scan again and he obviously does not have any ruptured disc or anything that might need surgery. He probably could go back to some form of light to sedentary type work. He cannot go back to his prior employment because of the amount of bending and lifting that he has to do.

Dr. Sandifer's office notes of October 17, 2001 indicate:

> Mr. Mitchell comes in and is basically having the same complaints as before with his back. I feel like he is not a candidate for any type of surgery. He could certainly go back to some form of light duty at this point and time. He probably should not do repetitive bending or lifting over 20 pounds. I have also reviewed several job descriptions today for approval or disapproval. I have refilled his medications also. He needs to continue on a good walking and exercise program. I feel like he is at MMI.

8

Dr. Sandifer's office notes of December 18, 2001 reflect the following:

[Mr. Mitchell] could go back to some form of light duty with no repetitive bending or lifting over 20 pounds. I don't feel like he can go back to his prior employment, which involved a great deal of heavy lifting.

Mr. Mitchell's last visit with Dr. Sandifer was on August 7, 2002. Dr. Sandifer's deposition testimony was consistent with his office notes. He testified:

I think he shouldn't do repetitive bending at the waist. He shouldn't lift over fifteen to twenty pounds. He shouldn't stand for over forty-five minutes to an hour at a time up to five hours in an eight hour day. He probably shouldn't sit over thirty to forty-five minutes at a time up to four to five hours in an eight hour day. . . . He probably – if he's driving, he may need to stop and get out and stretch every forty-five minutes to an hour or so.

The workers' compensation judge found Mr. Mitchell could return to his employment at Winnfield Funeral Home. He stated:

Doctor Sandifer only released him from employment at the funeral home under the belief that there was no light-duty work available.

Subsequently Mr. Darby in his vocational rehabilitation efforts locates jobs that involve washing and detailing and waxing motor vehicles, precisely what Mr. Mitchell was doing at the Nurturing Nook. I really doubt that he did anything other for the Nurturing Nook but wash vans.

So he was capable of the light-duty work of washing vans. He was taken off of only heavy-duty work. It's clear to this Court that if had Doctor Sandifer known he has a job at the Nurturing Nook washing vans that Doctor Sandifer would have permitted him to continue that work. The records reflect he received some monies from the Nurturing Nook all the way through the end of April 2001.

There's an FCE that says he can do light-duty work. His only explanation that he can't do any work at all is his complaints of pain which are totally disregarded by this Court because he lacks complete credibility.

He has no objective medical evidence of - of any injury to his back. His neurological examinations are normal. His orthopedic examinations are normal except for the very beginning when he does have spasms and a positive straight leg raising test.

An MRI was performed, reported by Doctor Sandifer as normal. The MRI results from the radiologist are not in the records so there's no indication that he has a bulging disk or even degenerative back disease.

. . . .

Moreover Mr. Mitchell had carpal tunnel surgery as a result of prior employment with ConAgra. And in May of 1999 Doctor Sandifer gave permanent restrictions to Mr. Mitchell of not lifting over ten to fifteen pounds, stated that these were permanent restrictions. Well, these are the same restrictions that Doctor Sandifer has placed upon Mr. Mitchell after examining for this back problem.

. . . .

And this Court concludes that he's entirely uncredible as to his complaints. Observed him carefully during the trial, went through the records very carefully.

. . . .

He has not shown this Court that he's unable to do the same type of work he was able to do when he began his employment with the Winnfield Holding Corporation.

The record does not support the finding of the workers' compensation judge that Mr. Mitchell could return to his prior employment. The medical evidence indicates Mr. Mitchell was capable of light duty work but was not capable of returning to Winnfield Funeral Home due to the heavy lifting. The workers' compensation judge found he was capable of returning to his job at the Nurturing Nook because " I really doubt that he did anything other for the Nurturing Nook but wash vans." There is no evidence in the record to support this conclusion. In fact, it seems unlikely that any employer would pay an employee $800.00 a month to wash and detail two vans. Mr. Mitchell testified, in addition to washing the vans (for which he was paid $200.00 a month), he maintained the property and buildings for the Nurturing Nook for which he received another $600.00 a month. If his job at the Nurturing Nook was considered light duty work, and was available to Mr. Mitchell, LWCC could have placed evidence of this fact in the record. It did not. In fact, no witness representing Winnfield Funeral Home or the Nurturing Nook testified at trial. While the medical evidence does support a finding Mr. Mitchell was capable of light duty work, we must determine whether LWCC met its burden of proving light duty job availability to

10

justify a reduction in benefits to Mr. Mitchell.

*Vocational Rehabilitation*

In order for an employer to satisfy its burden of proving job availability the Louisiana Supreme Court in *Banks v. Industrial Roofing & Sheet Metal Works, Inc.,* 96-2840 (La. 7/1/97), 696 So.2d 551, stated:

> [A]n employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence:
> (1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
> (2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
> (3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
> By "suitable job," we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.

*Id.* at 557.

In June 2001, LWCC hired Jeff Darby, a vocational rehabilitation consultant, to perform a job search. Mr. Darby met with Mr. Mitchell three times during the summer and also met with Dr. Sandifer to discuss Mr. Mitchell's work ability. Mr. Darby testified he located a cleanup person position at $6.00 per hour through Job Service and two porter positions. These jobs were available on October 3, 2001. Mr. Darby received approval of these jobs from Dr. Sandifer. He sent a certified letter dated October 3, 2001 to Mr. Mitchell notifying him of these jobs. He also spoke to Mr. Mitchell by telephone on October 11, 2001. Mr. Darby also located a van driver job. Mr. Mitchell did indicate he would apply for the van driver job and admitted to knowing the owner of the company.

Mr. Darby did a second labor market survey by contacting an assistant in the Natchitoches area to identify job leads. On October 10, 2001 he sent a second letter

11

by certified mail to Mr. Mitchell. The letter indicated available jobs with Red River Janitors and Aramark, a food service contractor. Both jobs were on the Northwestern College campus. Mr. Darby received prior approval from Dr. Sandifer for these jobs as well. Mr. Darby received a response from James Jefferson at Red River Janitors who indicated Mr. Mitchell did not want an interview. At trial, Mr. Darby was questioned as to whether these jobs were simply job leads or job openings. Mr. Darby testified there were job openings:

> Judge, it was my impression that they had job openings. And what I put in my letter to Mr. Mitchell is to apply for the jobs that are available. So I called it a job lead, because even if he applies - if he doesn't apply timely then he would not even be considered for the job. So my - my emphasis is on the - the injured worker applying for this job, because on the date that I spoke with the employer then would accept his application.

Mr. Darby testified the clean-up person and the two porter jobs were full-time jobs. The college campus jobs were part-time with full-time potential. We find LWCC was justified in reducing Mr. Mitchell's benefits based on the job search performed by Mr. Darby. The medical evidence supports a finding Mr. Mitchell was able to perform light duty work and Mr. Darby testified such work was available to him. LWCC reduced Mr. Mitchell's benefits in January 2002 using the lowest paying job available at $5.15 per hour, forty hours per week. While LWCC was justified is reducing Mr. Mitchell's benefits, the workers' compensation judge went even further and terminated all SEB. We find this was error on the part of the workers' compensation judge.

The purpose of SEB is to compensate an injured employee for the loss of wage earning capacity. *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52 (La.1993). An employee is entitled to receive SEB if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. La.R.S. 23:1221(3)(a). The amount of SEB is based upon the difference

12

between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. *Id.* The evidence establishes Mr. Mitchell was earning approximately $2,100.00 a month prior to his accident performing primarily medium to heavy duty work. After the accident he was restricted to light duty work. He is entitled to SEB based upon the difference between his pre-injury average monthly wage and his post-injury earning capacity.

We reverse that decision of the workers' compensation judge terminating all SEB. We order reinstatement of SEB benefits based upon the difference between Mr. Mitchell's pre-injury wage, using both his full-time and part-time wages, and his post-injury earning capacity, which was determined to be light duty work. We also reverse the decision of the workers' compensation judge terminating all medical benefits and order a reinstatement of medical benefits.

*Penalties and Attorney Fees*

LWCC miscalculated Mr. Mitchell's wages using only his full-time employment. Ms. Robinson testified from her reading of the workers' compensation statute Mr. Mitchell was only entitled to wages up to forty hours per week. In *Ben v. Holtrachem, Inc.*, 00-635 (La.App. 3 Cir. 11/2/00), 772 So.2d 326, this court held:

> The rule is well-settled that a workers' compensation claimant is entitled to penalties and attorney fees if benefits are withheld. To avoid the imposition of penalties and attorney fees an employee's right to compensation has to be reasonably controverted. La.R.S. 23:1201(F)(2). . . . [T]he proper method to calculate his AWW would be to give him credit for an eighty hour work week for the pay period ending May 16, 1993. Mr. Ben's wages were not reasonably controverted but withheld because of miscalculations and the failure of LWCC to acquire written payroll records from Cal Chlor at the time of the accident.

*Id.* at 329-30.

Likewise, we find LWCC could have inquired from their insured about Mr. Mitchell's part-time as well as full-time employment. Additionally, Ms. Robinson could have obtained the advice of counsel before interpreting the provisions of the

workers' compensation act on her own. Under the circumstances, we find Mr. Mitchell is entitled to penalties and attorney fees for LWCC's failure to reasonably controvert his claim. Accordingly, we award a penalty of $2,000.00 and attorney fees of $5,000.00 for work at the trial level and $2,500.00 for work at the appellate level. Additionally, Mr. Mitchell asks for penalties for termination of vocational rehabilitation services. It does not appear from the record that the employer terminated vocational services. LWCC hired Mr. Darby on a contract basis to locate available jobs. Mr. Mitchell did not avail himself of those jobs. It is not clear from the evidence what other vocational rehabilitation services Mr. Mitchell is seeking from the employer. We do not that find the employer terminated vocational rehabilitation services or that Mr. Mitchell has demonstrated he made demand for vocational services which were then refused by the employer. Therefore, we decline to award penalties.

## DECREE

Based on the foregoing review of the evidence, we reverse the decision of the workers' compensation judge terminating all SEB and medical benefits. We reinstate SEB benefits based upon the difference between Mr. Mitchell's pre-injury wage, using both his full-time and part-time wages, and his post-injury earning capacity, which was determined to be light duty work. We order a reinstatement of medical benefits, a $2000.00 penalty for improper calculation of benefits, and $7500.00 in attorney fees. All costs for this appeal are assessed to LWCC.

**REVERSED AND RENDERED.**